**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

KNITTLES TOWING, INC.,

     Plaintiff,

v.                                                Civ. No. 14-211 JCH/KK

DANLAR COLLISION, INC. *et al.*,

     Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF KNITTLES TOWING, INC.'S MOTION TO COMPEL**

     THIS MATTER comes before the Court on Plaintiff Knittles Towing, Inc.'s Motion to

Compel (Doc. 79), which was filed on October 6, 2014.  The Court, having reviewed the

submissions of the parties and the relevant law, and being otherwise fully advised, FINDS that

the Motion is well taken in part, and hereby GRANTS the motion in part and DENIES it in part

as follows.

**Plaintiff's Request for Production No. 11**

     Plaintiff first moves the Court to compel Defendants Danlar Collision, Inc., Danlar

Towing, L.L.C., Danlar Corporation, Inc., Danlar Towing North, L.L.C., Larry Knippel, and Dan

Knippel ("Danlar Defendants") to respond to Plaintiff's Request for Production No. 11 ("RFP

No. 11").  (Doc. 79, Ex.1 at 2.)  In RFP No. 11, Plaintiff sought from the Danlar Defendants

> [a]ny and all records, of any nature or type, including time sheets, mileage sheets,
> tow sheets, gross receipts filings, and any and all other records within the
> Defendants' possession and control concerning Class C & D towing, as defined
> by New Mexico PRC, from the year 2005 to date, including the names of all
> drivers, and the amount of gross revenue by each of the model year 2000 and
> model year 2008 vehicles as defined by Mr. Knipple [sic] in his deposition.

(*Id.*)  Instead of responding to this request, the Danlar Defendants objected that the phrases

"Class C & D towing, as defined by New Mexico PRC," and "any and all records, of any nature

1

or type…concerning Class C & D towing," are vague, and that the request is "not reasonably calculated to lead to the discovery of admissible evidence." (*Id.*) Plaintiff's counsel sent an electronic mail message to the Danlar Defendants' counsel on September 10, 2014 in an attempt to resolve the dispute without filing a motion to compel (Doc. 91-4); however, the Danlar Defendants have maintained their objections and declined to respond to this request. (Doc. 85.)

The Danlar Defendants' objection that RFP No. 11 is vague is without merit. The phrase "Class C & D towing, as defined by New Mexico PRC," far from being vague, is quite specific. The New Mexico Public Regulation Commission's Motor Transportation Rules define the terms "Class C" and "Class D" towing. (Doc. 79, Ex. 3.) Defendant Larry Knippel's deposition testimony, as well as defense counsel's September 9, 2014 letter to Plaintiff's counsel, show that the Danlar Defendants are familiar with these terms and know what they mean. (Doc. 79, Ex. 2 at 1; Doc. 85-5 at 2.) The Danlar Defendants' vagueness objection to RFP No. 11 is therefore overruled.

The Danlar Defendants' next objection, that RFP No. 11 is not reasonably calculated to lead to the discovery of admissible evidence, is considerably more complex, although ultimately no more successful. According to Federal Rule of Civil Procedure 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense…. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1); *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1188-89 (10th Cir. 2009); *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1238 (10th Cir. 2000); *Velasquez v. Frontier Med., Inc.*, 229 F.R.D. 197, 199-200 (D.N.M. 2005). "When the district court . . . intervene[s] in discovery, it has discretion in determining what the scope of discovery should be. The actual scope of discovery should be

determined according to the reasonable needs of the action." *In re Cooper Tire & Rubber Co.*, 568 F.3d at 1189.

Plaintiff asserts that RFP No. 11 is reasonably calculated to lead to the discovery of admissible evidence, because it seeks information that is "relevant on the issue of damages." (Doc. 79 at 2.)  Plaintiff observes that the remedies available under 15 U.S.C. § 1117(a) for its claims pursuant to 15 U.S.C. § 1125(d) include the Danlar Defendants' profits.  (Doc. 91 at 2.) According to Plaintiff, RFP No. 11 seeks documentation that the Danlar Defendants' profits increased after they purchased the internet domain names www.knittlestowing.com, www.knittletowing.com, and www.knittletow.com ("contested domain names"), and forwarded traffic from the contested domain names to a Danlar website.  (*Id.* at 2-3.)  Plaintiff states that its request is directed to Class C and D towing specifically because the Danlar Defendants bought an additional Class D and D towing vehicle after it appropriated the contested domain names. (*Id.*)  According to Plaintiff, the increased income this vehicle generated would be an "excellent indication" of profits derived from the Danlar Defendants' use of the contested domain names. (*Id.*)

The Danlar Defendants object that the documents Plaintiff seek are nevertheless irrelevant because their appropriation of the contested domain names could not have increased their business.  (Doc. 85 at 3-8.)  The Danlar Defendants contend that they bought the contested domain names in January 2008, but only configured the names to forward internet users to their website from April to October 2011.   (*Id.* at 3-4.)   They further contend that there were "virtually" no forwards from the contested domain names to their website during that period. (*Id.*)  In support of these contentions, they rely on the deposition testimony of Defendant Darlene Motley and the report of their expert witness John Kuster.  (*Id.* at 3-5.)  On the strength of this

evidence, the Danlar Defendants argue that they could not have gained any business from appropriating the contested domain names, and Plaintiff could not have been damaged by their actions.

As a preliminary matter, the Court must consider the remedies available under 15 U.S.C. § 1117(a) for claims made pursuant to 15 U.S.C. § 1125(d). These remedies are "subject to the principles of equity," and include "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). "[I]t is not required that the plaintiff demonstrate actual damages to sustain a profit award." *Western Diversified Servs., Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1272 (10th Cir. 2005). Instead, a "plaintiff[] must show *either* actual damages *or* willful action on the part of the defendant as a prerequisite to recover disgorgement of profits." *Klein-Becker USA, L.L.C. v. Englert*, 711 F.3d 1153, 1161 (10th Cir. 2013) (emphasis added). When a plaintiff relies on actual damages in seeking disgorgement of a defendant's profits, the plaintiff need not show "an exact dollar amount of actual damages," but only "that it suffered actual damages." *Id.*

"To assist the court in arriving at the appropriate award for disgorgement of profits, the plaintiff is required to prove defendant's sales only, while the defendant has the burden of proving all elements of cost or deduction claimed." *Id.* at 1163 (internal quotations omitted). "[T]he plaintiff has only the burden of establishing the defendant's gross profits…from the infringing activity with reasonable certainty, and the defendant thereafter bears the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Id.* (quoting *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), *superseded by statute on other grounds*, Pub. L. No. 106-43 § 3(b)); *see also Blue Bell Co. v. Frontier Refining Co.*, 213 F.2d 354, 363 (10th Cir.

1954) (district court "very properly placed the burden upon [defendants] of showing that the profits realized by them were not attributable to the infringement"); *cf. Estate of Bishop v. Equinox Int'l Corp.*, 256 F.3d 1050, 1055 (10th Cir. 2001) (district court acted within its "wide discretion when it weighed the equitable considerations presented…and determined both that a full accounting of profits was not necessary and that the [plaintiff] was not equitably entitled to a portion of [the defendant's] profits").  "Although plaintiffs must generally establish damages with specificity, some estimation is acceptable if necessitated in part by the [d]efendants' poor record keeping." *Klein-Becker USA, L.L.C.*, 711 F.3d at 1163; *see also Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374 (10th Cir. 1977) ("[A] plaintiff's inability to prove with precision [the amount necessary to make itself whole] does not preclude recovery since the most elementary conception of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

The law thus dictates that, in addition to actual damages, Plaintiff may be entitled to the disgorgement of the Danlar Defendants' profits from any infringing activity in which they are found to have engaged.  Moreover, if Plaintiff establishes that the Danlar Defendants' conduct was willful, Plaintiff need not prove any actual damages to be entitled to such profits.  Rather, Plaintiff need only prove Defendants' "gross profits…from the infringing activity with reasonable certainty, and [the Danlar Defendants] thereafter bear[] the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Klein-Becker USA, L.L.C.*, 711 F.3d at 1163.  On its face, then, documentation regarding whether the Danlar Defendants' profits increased after they appropriated the contested domain names is relevant to any potential disgorgement of such profits under 15 U.S.C. § 1117(a), and so is discoverable under Rule 26(b)(1).

As noted above, the Danlar Defendants contend that their evidence eliminates any possibility that their appropriation of the contested domain names caused their profits to increase, thereby negating any relevance such an increase might otherwise have had.  Underlying the Danlar Defendants' argument is the premise that their appropriation of the contested domain names could only have increased their business if a large number of customers were forwarded from a contested domain name to the Danlar Defendants' website, and those customers then hired the Danlar Defendants to tow their vehicles.  The Danlar Defendants claim that their evidence definitively proves that this did not occur.  Thus, they argue, their appropriation of the contested domain names could not have increased their business, and any evidence of an increase in business is irrelevant and not discoverable.

There are at least three problems with this argument.  First, it is contrary to the Danlar Defendants' own expectations.  The Danlar Defendants paid for the contested domain names, and paid Defendant Motley to purchase, renew, and configure them to forward internet users to their website.  (Dec. 85-2 at 4-6; Docs. 85-3, 85-6.)  It seems only reasonable to conclude that the Danlar Defendants expected these expenditures to make them money.

Second, the Danlar Defendants overlook the possibility that a small number of forwards from a contested domain name to their website could conceivably have decreased Plaintiff's business and commensurately increased their own.  Defendant Motley observed that if a potential customer typed in a contested domain name and was forwarded to the Danlar Defendants' website, that customer would "probably assume that Knittles Towing isn't in business."  (Doc. 85-2 at 5.)  If a single forward caused an insurance company, automobile club, or other organization to make such an assumption, it could have redirected a significant amount of business from Plaintiff to the Danlar Defendants.  The Court therefore rejects the Danlar

Defendants' assumption that Plaintiff must prove a large number of forwards from the contested domain names to the Danlar Defendants' website to causally connect the Danlar Defendants' appropriation of the contested domain names to an increase in their business.  On the contrary, even if Plaintiff can prove only a handful of forwards, the possibility that the Danlar Defendants profited from their appropriation of the contested domain names remains, and discovery regarding their profits should be allowed.

Finally, the Danlar Defendants' proffered evidence leaves intact the possibility that there were at least some forwards from the contested domain names to a Danlar website.  Defendant Motley testified in her deposition that "there were virtually no forwards, and those forwards would have been me testing it."  (Doc. 85-2 at 8.)  However, this testimony is not irrefutable. Even if Defendant Motley were an entirely credible and unbiased witness, which Plaintiff may certainly contest, she based her testimony on "analytics reports" whose reliability the Danlar Defendants have not established.  (*Id.*)  Moreover, if the "analytics reports" in question are, as seems likely, the same reports on which the Danlar Defendants' expert witness Mr. Kuster relied, then they do not necessarily support Defendant Motley's assertion for the reasons discussed below.

Mr. Kuster's report, in turn, allows for the possibility of a significantly greater number of forwards from the contested domain names to the Danlar Defendants' website than the Danlar Defendants would have the Court believe.  First, Mr. Kuster's report indicates that the contested domain names were pointed to a Danlar website at some time between February 2010 and February 2011, as well as from April to October 2011.  (Doc. 85-4 at 4, 6-7.)  Specifically, Mr. Kuster found an "archive instance of a 'Knittles' website…[that] referenced the Danlar business" on May 13, 2010.  (*Id.* at 6.)  From this instance, Mr. Kuster determined that the "Knittles

website" in question was "pointed to [a] 'non-production' danlar.com website" for an unknown period of time.  (*Id.* at 10.)  Mr. Kuster had no information about "how long this 'non-production' website version was available online.  Additionally, no information regarding visits to this 'non-production' website version is available."  (*Id.*)  Mr. Kuster ultimately opined that "very few users, if any at all, ever typed…one of the three domain names and were directed to the 'non-production' danlar.com website."  (*Id.*)  "Very few users" are not none, however, and Mr. Kuster's opinion on this point is based on inferences which a disinterested fact finder could choose not to draw.[1]

In addition, according to a Google Analytics Report referenced in Mr. Kuster's report, there were at least forty-four forwards from other domain names, including but not limited to the contested domain names, to the Danlar Defendants' website in 2011.  (*Id.* at 7-8.)  Any or all of these forwards could have been from a contested domain name.  (*Id.*)  Mr. Kuster concludes that only three of them actually were, based on a "site analysis report."  (*Id.* at 8-9.)  However, this "site analysis report" is facially unreliable, because according to Mr. Kuster "[t]he actual source (*i.e.* who and how generated) of this report is unknown."  (*Id.* at 8.)  In short, the Danlar Defendants' evidence allows for the possibility that internet users were forwarded from the contested domain names to a Danlar website an unknown number of times from February 2010 to February 2011, and up to forty-four times from April to October 2011.  This amply allows for

---

[1] There is also evidence that other competitors' domain names were configured to forward to the Danlar Defendants' website in 2010, which supports the inference that the contested domain names were similarly configured at that time.  (*See* Doc. 86-5 (Nov. 29, 2010 electronic mail message from Defendant Motley to Defendant Larry Knippel encouraging him to continue forwarding the domain names duggertowing.com, duggertow.com, and duggerstowing.com to the Danlar Defendants' website)).

the possibility that the Danlar Defendants profited from their appropriation of the contested domain names.[2]

Based on the foregoing, the Court concludes that Plaintiff's RFP No. 11 is reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff is entitled to seek disgorgement of the Danlar Defendants' profits from its alleged wrongful acts.  Documentation showing that the Danlar Defendants' profits increased after they appropriated the contested domain names would be relevant to this remedy.  The evidence before the Court allows for the possibility that Defendants' appropriation of the contested domain names increased their profits by sending at least some potential customers from the contested domain names to a Danlar website in 2010 and 2011.  To the extent Plaintiff's evidence is at present imprecise, this "does not preclude recovery since…the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."  *Big O Tire Dealers, Inc.*, 561 F.2d at 1374.  Plaintiff need only prove the Danlar Defendants' "gross profits…from the infringing activity with reasonable certainty, and [the Danlar Defendants] thereafter bear[] the burden of showing which, if any, of [their] total sales are not attributable to the infringing activity."  *Klein-Becker USA, L.L.C.*, 711 F.3d at 1163. The Danlar Defendants' proffered evidence tending to show a limited number of forwards would certainly be relevant to its burden of proof on this point in dispositive motions or at trial. "However, a party should not be limited by its opponent's theory of the case in determining what is discoverable."  *In re Cooper Tire & Rubber Co.*, 568 F.3d at 1192.  For all of the above

---

[2] For the first time in its reply, Plaintiff also suggests that the documents it seeks in RFP No. 11 are relevant because it could use them to identify which customers hired the Danlar Defendants after having been forwarded from a contested domain name to the Danlar Defendants' website.  (Doc. 91 at 2, 5.)  Specifically, Plaintiff claims that responsive towing invoices would show "the identity of individuals who could be contacted to determine exactly where [their] information was garnered."  (*Id.* at 5.)  The Court need not address this argument, to which the Danlar Defendants have not had the opportunity to respond, because the documents sought are reasonably calculated to lead to the discovery of admissible evidence for the reasons already discussed.

reasons, Plaintiff's RFP No. 11 is reasonably calculated to lead to the discovery of admissible evidence, and the Danlar Defendants' objection to the contrary is overruled.

The Danlar Defendants raise two additional objections to Plaintiff's RFP No. 11 for the first time in their response to Plaintiff's motion to compel, specifically, that the request is overbroad as to time and overburdensome. The Court notes that these objections are untimely. However, Rule 26 requires the Court to

> limit the…extent of discovery otherwise allowed by these rules…if it determines that…the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C); *In re Cooper Tire & Rubber Co.*, 568 F.3d at 1193. The Court is not required to "make formal and explicit findings regarding each of the[se] factors," but rather should use them "as indicia of proper use of discovery mechanisms." *Id.* (quotation omitted). The Court will consider the Danlar Defendants' belated objections in light of these factors.

Initially, the Court agrees that RFP No. 11 is overbroad as to time. The request seeks documents "from 2005 to date." (Doc. 79, Ex. 1 at 2.) The evidence before the Court shows that the Danlar Defendants purchased the contested domain names in January 2008 and surrendered them in October 2011. (*See, e.g.*, Doc. 85-4 at 3-5.) The evidence further suggests that the earliest the contested domain names were configured to forward to a Danlar website was February 2010, and the latest was October 2011. Plaintiff argues that the much broader time frame of its request "would show the increase that occurred from prior to this scheme through the termination of this scheme." (Doc. 91 at 3.) Nevertheless, the Court finds that, in light of the factors listed in Rule 26(b)(2)(C), it would be excessive to require the Danlar Defendants to produce extensive documentation of their business volume for a period of nine years. The Court

will therefore limit the scope of RFP No. 11 from February 2008 to October 2013.[3] This reduces the time frame from nine to about five-and-a-half years, and should more than adequately allow Plaintiff to ascertain whether and to what extent the Danlar Defendants' profits increased after appropriating the contested domain names, and decreased after surrendering them.

Finally, the Danlar Defendants object that RFP No. 11 is overburdensome, because it would require them to individually review all of their towing records for the specified time frame to determine whether each vehicle towed was a Class C or D vehicle. (Doc. 85 at 8.) Plaintiff offered to narrow the scope of the request to eliminate the need for the Danlar Defendants to conduct this burdensome review. Specifically, Plaintiff's counsel proposed to accept "towing records" for the towing vehicles capable of Class C and D towing "without any attempt to determine [the] individual class" of the vehicles towed. (Doc. 91-4.) The Danlar Defendants do not directly concede that their towing invoices indicate which towing vehicle performed a particular tow, but their counsel's September 9, 2014 letter suggests that they do. (Doc. 85-5 at 4.) Also, Defendant Dan Knippel testified that these records are computerized. (Doc. 91-2 at 3-4.) As such, responding to the narrowed request should not be overburdensome. The Court will therefore compel the Danlar Defendants to produce documents responsive to Plaintiff's RFP No. 11, for the time period of February 2008 to October 2013, limited to documents regarding the Danlar Defendants' towing vehicles capable of Class C and D towing, regardless of the class of vehicle towed.

### Plaintiff's Request for Production Number 12

Plaintiff also moves the Court to compel the Danlar Defendants to respond more fully to Plaintiff's Request for Production No. 12 ("RFP No. 12"). (Doc. 79, Ex.1 at 3.) In RFP No. 12,

---

[3] This time period is from two years before the first possible forward from a contested domain name to a Danlar website, to two years after the last possible forward.

Plaintiff sought the Danlar Defendants' "complete file including all emails and evidence of payment to Darlene Motley or Karmic Visions." (*Id.*)  The Danlar Defendants objected that the phrase "your complete file" is vague, that the request is "duplicative" of Plaintiff's Requests for Production Numbers 1, 2, 3, 5, and 9 to these Defendants, and that the request is "duplicative" because Defendant Motley already produced the invoices and electronic mail messages requested on July 30, 2014.  (*Id.*)  Notwithstanding their objections, the Danlar Defendants produced six pages of documents in response to this request.  (*Id.*)

The Court rejects the Danlar Defendants' objection that the phrase "your complete file" is vague.  While not a model of eloquence or specificity, the ordinary meaning of the term in context is plain.  *See Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D. 295, 210 (D. Kan. 1996) (parties "should exercise reason and common sense to attribute ordinary definitions to terms and phrases" used in discovery requests).  It seems clear that Plaintiff is seeking all documents in the Danlar Defendants' possession, custody, or control regarding their business interactions with Defendant Motley.  The Danlar Defendants' vagueness objection is therefore overruled.

Regarding the Danlar Defendants' objection that RFP No. 12 is duplicative of earlier requests for production to these Defendants, RFP No. 12 does not request the same category of documents as RFPs Nos. 1, 2, 3, 5, and 9 and is not duplicative.  (*See* Doc. 53-3.)  There is likely some overlap between documents responsive to the earlier requests and documents responsive to RFP No. 12.  If so, the Danlar Defendants may identify all responsive documents already produced by Bates number in lieu of producing them again, but must produce any additional responsive documents.  It is troubling that Defendants produced about sixty-four pages of documents for the first time in response to RFP No. 12, while claiming that it is duplicative of

earlier requests for production.  This seems like a tacit admission that the Danlar Defendants failed to produce documents responsive to the earlier requests, and now seek to use to that failure to avoid responding to RFP No. 12.  For these reasons, this objection is also overruled.

Finally, the Danlar Defendants object that because Defendant Motley has already produced all electronic mail messages and invoices exchanged between her and the Danlar Defendants, the Danlar Defendants should not have to produce them, too.  This objection is also without merit.  Plaintiff is entitled to discover what relevant documents are in the Danlar Defendants' possession, custody, or control.  If responsive documents in the Danlar Defendants' possession, custody, or control are identical to documents Defendant Motley has already produced, then the Danlar Defendants may identify such documents by Bates number in lieu of producing them also.  However, the Danlar Defendants must review their own documents, determine whether they differ from Defendant Motley's, and produce any responsive documents that are not identical.  For all of these reasons, the Danlar Defendants' objections to RFP No. 12 are overruled.

Having addressed the Danlar Defendants' objections to RFP No. 12, the Court now turns to the sufficiency of the Danlar Defendants' response to the request.  Plaintiff contends that the documents the Danlar Defendants produced in response to RFP No. 12 are incomplete. According to Plaintiff, the Danlar Defendants produced eleven pages of documents in response to Plaintiff's first set of requests for production to them, while Defendant Motley produced about 1,000 pages.  (Doc. 79 at 3.)  Subsequently, in their response to RFP No. 12, the Danlar Defendants produced "a few pages of invoices and some documentation but none of the emails," and later supplemented their response with "checks to [Defendant] Motley."  (*Id.* at 3-4.) Plaintiff believes that the Danlar Defendants possess additional documents responsive to RFP

13

No. 12, although it concedes that it is, in fact, "[i]mpossible to tell if everything has been produced."  (Doc. 91 at 4.)  Plaintiff specifically identifies as missing from the Danlar Defendants' response:  (1) electronic mail messages exchanged between the Danlar Defendants and Defendant Motley from 2008 to 2011; (2) credit card statements reflecting payment of Defendant Motley's invoices; and, (3) a log of any documents withheld on a claim of privilege. (*Id.*)

The Danlar Defendants, in turn, assert that they have produced all documents responsive to RFP No. 12, except for privileged documents.  (Doc. 85 at 10.)  Specifically, they produced a "computerized printout confirming …payment of various invoices received from" Defendant Motley, which correlates with invoices she produced.  (*Id*.)  The Danlar Defendants later supplemented their response with fifty-eight pages of paid invoices and their accompanying checks, which were "retrieved from storage."  (*Id.*)  Defendant Larry Knippel testified that he looked for electronic mail messages or other documents from before 2011 but could not find them.  (Doc. 85-7 at 3-6.)  According to the Danlar Defendants, the only remaining documents they possess that are responsive to the request are "privileged documents" generated after October 24, 2011, when another competitor filed a similar lawsuit against them.  (Doc. 85 at 10.)

The Danlar Defendants' protests that they have produced all documents responsive to this request are not particularly persuasive, in light of the fact that they produced fifty-eight pages of responsive documents only after two sets of discovery requests had been served and an informal request for supplementation was made.  Moreover, they appear to concede that they have not produced responsive electronic mail messages generated before 2011, or credit card statements referencing payments to Defendant Motley, both of which they should be able to retrieve.  As such, the Court will order the Danlar Defendants to produce any and all responsive electronic

mail messages in their possession, custody, or control, including those generated before 2011, and any and all credit card statements in their possession, custody, or control referencing payments any Danlar Defendant made to Defendant Motley or her business.

The Danlar Defendants also admit in their response to Plaintiff's motion to compel that they have withheld documents responsive to RFP No. 12 based on an assertion of privilege. (Doc. 85 at 10.) "The party seeking to assert the attorney-client privilege or the work product doctrine as a bar to discovery has the burden of establishing that either or both is applicable." *BarclaysAmerican Corp. v. Kane*, 746 F.2d 653, 656 (10th Cir. 1984); *Motley v. Marathon Oil Co.,* 71 F.3d 1547, 1550 (10th Cir. 1995). "The party must bear the burden as to specific questions or documents, not by making a blanket claim." *In re Foster*, 188 F.3d 1259, 1264 (10th Cir. 1999); *see also FDIC v. United Pac. Ins. Co.*, 152 F.3d 1266, 1276 (10th Cir. 1998) ("To satisfy this burden, it is insufficient for the [party] merely to contend that documents contain privileged information.").

In the present matter, the Danlar Defendants did not object to RFP No. 12 on the basis of privilege, nor have they identified the responsive documents withheld on this basis in any way at all, much less with sufficient specificity to allow Plaintiff or the Court to determine whether they are privileged. Rather, they have offered only the "blanket claim" of privilege that *In re Foster* rejected. 188 F.3d at 1264. The Court will therefore order the Danlar Defendants to produce a privilege log of any documents responsive to RFP No. 12 that they have withheld on a claim of privilege. Plaintiff will then have the opportunity to file a motion to compel production of any withheld documents that it reasonably believes are not privileged. For all of the above reasons, the Court will grant Plaintiff's motion to compel a more complete response to RFP No. 12.

**<u>Attorneys' fees under Rule 37</u>**

In its motion to compel, Plaintiff did not request attorneys' fees pursuant to Federal Rule of Civil Procedure 37.  However, the Court is required to address this issue, because under Rule 37 the imposition of fees is sometimes mandatory.  Specifically, if a party's motion to compel is granted, the Court must generally require the opposing party and/or its counsel to pay the movant's reasonable expenses incurred in making the motion.  Fed. R. Civ. P. 37(a)(5)(A). However, the Court must not order such expenses if

> the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; the opposing party's nondisclosure, response, or objection was substantially justified; or, other circumstances make an award of expenses unjust.

<u>Id.</u>  Similarly, Rule 37(a)(5)(B) provides that if a motion to compel is denied, the Court must generally award expenses to the party opposing the motion, but again, not if "the motion was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(a)(5)(B).  Finally, Rule 37(a)(5)(C) provides that "[i]f the motion is granted in part and denied in part, the court…may…apportion the reasonable expenses for the motion."  Fed. R. Civ. P. 37(a)(5)(C).

In this case, the Court has granted the larger part of Plaintiff's motion to compel, and finds that the larger part of the Danlar Defendants' responses and objections were not substantially justified.  The Danlar Defendants have not argued that Plaintiff failed to make a good faith attempt to obtain the requested discovery without court action, and the Court finds that no other circumstances make an award of expenses unjust.  The Court will therefore in its discretion award Plaintiff a portion of its attorneys' fees and costs incurred in bringing this motion.  Plaintiff is directed to submit its counsel's time records and documentation of expenses

related to this motion so that the Court may determine the appropriate amount of fees and costs to be awarded.

<u>**Conclusion**</u>

In summary, the Court orders as follows.  The Danlar Defendants are ordered to produce documents responsive to Plaintiff's RFP No. 11 for the time period from February 2008 to October 2013, limited to documents regarding the Danlar Defendants' towing vehicles capable of Class C and D towing, regardless of the class of vehicle towed.   The Danlar Defendants are also ordered to produce any and all electronic mail messages in their possession, custody, or control responsive to Plaintiff's RFP No. 12, including those generated before 2011, and any and all credit card statements in their possession, custody, or control, referencing payments any Danlar Defendant made to Defendant Motley or her business.  The Danlar Defendants are further ordered to produce a privilege log of all documents responsive to RFP No. 12 that they have withheld on a claim of privilege.  Plaintiff will have fourteen (14) days from its receipt of the log to file a motion to compel production of any withheld documents that it reasonably believes are not privileged.  The Danlar Defendants are ordered to produce the documents described above within seven (7) calendar days of entry of this Order.  Finally, Plaintiff is to submit its counsel's time records and documentation of expenses related to this motion to the Court within fourteen (14) days of entry of this Order, so that the Court may determine the appropriate amount of fees and costs the Danlar Defendants should be required to pay.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE